# NILES *v.* CEDAR POINT CLUB.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH
CIRCUIT.

No. 80. Argued November 16, 17, 1899. — Decided December 4, 1899.

Generally, in public surveys, a meander line is a line which courses the banks of navigable streams or other navigable waters ; but in this case it distinctly appears from the field. notes and the plat, that the deputy surveyor by whom it was surveyed-in 1834 and 1835, and whose acts were approved by the surveyor general, stopped his surveys at what he called a marsh, which intervened between the point where he stopped and the waters of Lake Erie, and thus limited the land which the United States in 1844, following that survey, patented to the person under whom the appellant claims, and thus excluded the marsh, leaving to subsequent measurements the actual determination of the line of separation between the lands thus patented, and those which the Government did not propose to convey.

One receiving a patent will not ordinarily be heard to insist that by reason of an error on the part of a surveyor, more land was bought than was paid for, or than the Government was offering for sale.

This marsh was properly held not to be regarded as land continuously submerged.

THIS controversy is between two claimants to land, one holding a patent therefor from the United States and the other claiming it by virtue of its contiguity to other land for which

a United States patent was held. A statement of facts was agreed upon by the parties, and that statement, with some slight additional testimony, formed the basis of a decree in the Circuit Court in favor of the plaintiff, which was affirmed by the Court of Appeals, 54 U. S. App. 668, to review which last decision this appeal was taken.

The facts are these: In the years 1834 and 1835 Ambrose Rice, a deputy surveyor, surveyed and subdivided into sections and quarter sections fractional township 9 south, in range 9 east, and townships 9 and 10 south, in range 10 east, the same being situated in the northern part of Ohio and adjacent to Lake Erie. From his field notes, duly certified to the surveyor general of that land district, the latter prepared a correct plat of the townships, showing the subdivisions thereof, and marking all the actual survey lines and the corners designated by said survey. By the field notes and plat certain sections appear to be fractional, the line on the north being meandered in a general direction from the northwest to the southeast. The tract to the north of this line was described as "flag marsh" and "impassable marsh and water." Paragraphs 4, 5 and 6 of said agreed statement of facts are as follows:

"4. Said plat showed the northerly line of the mainland portion of said survey, a line with its intersection of each township and section line, evidenced by a post placed at such intersection, as the said line was actually surveyed and marked as shown by said certified field notes, beginning on the west line of section 19, in town 9 south, range 9 east, and thence running in a general easterly and southerly, but meandering and tortuous course to and across the south line of section 11, in town 10 south, range 10 east.

"5. The said plat showed the said line of said survey from the west line of said township to a point 2 chains easterly from its intersection of the line between sections 21 and 22 in town 9, range 9, to be the shore of Maumee Bay; and from that point southerly and easterly the plat shows this line on the northerly and easterly sides of fractional sections 22, 27, 26 and 25 in town 9, range 9, sections 30, 31 and 32 in town 9, range 10, and sections 4, 9, 10 and 11 in town 10, range 10, to be the boundary

of what is called the ' flag marsh ' and ' impassable marsh and water.'

" 6. As shown in and upon said original plat, somewhat east of north from the point where this line of the survey crosses the north and south quarter line through section twenty-two, town 9, range 9, and about a mile and a half from it, began an island called Cedar Island. This extended northerly for more than half a mile, and then southeasterly to a point opposite the said line along the northerly side of section 25 in said township. A short distance southeast of this another island began and extended southeasterly beyond the north line of section 5, in town 10, range 10, projected easterly. Then there was a narrow inlet. A third island began on the easterly side of this inlet, and extended southeasterly almost to what would be the east line of section 11, town 10, range 10. Between these islands and the tortuous line above described was the space designated ' flag marsh ' and ' impassable marsh and water.' No surveyed lines other than the township lines crossed either the intervening marsh or the islands. The northwestern island was named ' Cedar ' and was the largest. The plat showed it as containing 53:83 acres, all in town 9, range 9. The one next east of it was marked as ' Sandy Island.' The plat showed that 7.52 acres of it were in town 9, range 9 ; 28.49 acres in town 9, range 10, and 1.18 acres in town 10, range 10. The southeastern island was marked as ' Crane Island,' containing 18.38 acres, all in town 10, range 10. From the northwest end of Cedar Island to the southeast end of Crane Island was about nine and one half miles. Norman Strait separated Cedar and Sandy islands. Lily Strait lay between Sandy and Crane, and Crane Creek entered the lake at the east end of Crane Island.

" The field notes on the plat showed that the circumference of each island was surveyed or meandered. The plat and marginal field notes also show that the southerly edge of the ' flag marsh,' ' impassable marsh and water ' was surveyed, and that the lines of the fractional sections southerly of the said marsh and water were identical with the southerly edge of the marsh. The computed areas of the fractional sections and of their respective subdivisions, as shown upon the said plat, con-

formed to the area included within the said surveyed lines, and did not nor any thereof include any part of either marsh, water or islands."

In July, 1844, patents for several of these fractional sections facing on this marsh were issued to Margaret Bailey, under whom the appellant claims. The patents each recite the number of acres granted, and each states that the tract is a fractional section " according to the official plat of the survey of said lands returned to the General Land Office by the surveyor general, which said tract has been purchased by the said Margaret Bailey."

In 1852 the State of Ohio applied under the Swamp Land Act of September 28, 1850, c. 84, 9 Stat. 519, for several thousand acres of lands within the State, among them these marsh lands. This application was, so far as these lands are concerned, rejected by the land department, the official minute on the application being " not swamp and nearly all sold." In 1881 John B. Marston, under instruction from the General Land Office, surveyed and subdivided into sections and quarter sections the area marked upon the surveyor general's plat, above referred to, as " flag marsh " and " impassable marsh and water." The field notes of this survey were returned to the General Land Office and approved, and a plat made, as required. Thereafter the lands thus surveyed and platted were patented by the United States, and the title so conveyed passed by subsequent deeds to the plaintiff below, appellee here. Disclosing the condition of these lands, paragraphs 16 and 17 of the statement of facts are as follows:

" 16. At the time of the making of the survey by Ambrose Rice the waters of Lake Erie were above their ordinary stage, and there was more than the usual volume of water standing upon the land in controversy herein and flowing to and upon the same from the large bodies of land now in Ottawa, Wood and Lucas counties, respectively, having their drainage to and through the said premises in controversy herein.

" 17. The general character, description and condition of the said land surveyed by said Marston was by him correctly set forth under the title ' General Description ' in the field

notes of the said survey so as aforesaid by him certified to the Commissioner of the General Land Office.

"That concerning the portion of said survey in town 9 south, range 9 east, reciting, to wit:

"'The surface of that part of this fractional township, comprised in this survey, is covered with a deep marsh of grass, canes or reeds, wild rice, etc. Many parts of it, particularly in the south and west parts, are mown for a kind of coarse hay. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the natural drainage from the woods on the south and west, which, without any well-defined channel, finds its way across the marsh to the lake. Again, in heavy gales of wind it is subject to inundations from the lake, which, upon the subsidence of the gale or change of direction in the wind, slowly finds its way out again into the lake. It is bounded along the lake by a sand beach averaging 1 chain in width and 3 feet in height.'

"That concerning the portion of said survey in town 9 south, range 10 east, reciting, to wit:

"'The surface of this fractional township is covered with a deep marsh of grass, canes or reeds, wild rice, etc. Much of the south part can be mown for marsh hay, being in a measure drained by a canal that has been constructed in the township south. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the drainage from woods on the south and west, which spreads over the entire surface and without any positive channel finds its way to the lake.

"'Again the township is subject to inundations from the lake during heavy gales of wind, which, upon the termination of the gale or a change in the direction of the wind, slowly finds its way back into the lake.

"'This fractional township is bounded on the northeast by Lake Erie; between the lake and the marsh proper is a sand beach, averaging 3 feet high and 1 chain in width, generally covered with bushes and small trees of oak, poplar, willow and cottonwood.'

"That concerning the portion of said survey in town 10 south, range 10 east, reciting, to wit ·

" ' The descripton for this township must necessarily be similar to that of the two preceding townships. The surface of that part of the township comprised in this survey is one large swampy marsh land, generally very wet and boggy. Its surface is covered with grass, canes, (or joint grass,) wild rice and such like marsh productions, reaching to a height of ten or more feet. Some parts, especially on sections 10 and 11, can be pastured, but the larger portion is filled with bogs and pond holes, connected by narrow and tortuous channels.

" ' It receives the drainage from the woods on the south and west and is subject to inundations from the lake. On the prevalence of strong southwest winds this water flows from the marsh into the lake, and upon the occurrence of northeast winds the lake floods the marsh. The principal outlets and inlets are Crane Creek and Ward's Canal. This canal is an improvement made by C. B. Ward, of Detroit, Michigan, on section 4, and running across section 5 for the purpose of getting vessels and ship timber from his shipyard on section 5. It is built without locks and is really only a great ditch. Waterway, 50 feet; depth, 7 feet. The buildings (or sheds) at the fishing stations 4 and 11 are the only other improvements.

" ' A comparison of the survey made by Ambrose Rice in 1834 and 1835 with that made by John B. Marston in 1881 indicates that Sandy and Crane Islands washed somewhat shoreward during the period intervening between the making of said respective surveys.' "

*Mr. Henry T. Niles* for appellant. *Mr. Frank C. Dougherty* was on his brief.

*Mr. Thomas Emery* for appellee.

MR. JUSTICE BREWER, after making the above statement of the case, delivered the opinion of the court.

But little can be added to the opinion of the Court of Appeals, whose conclusions we approve. The meander line

run by surveyor Rice along the northern borders of the tracts patented to Margaret Bailey may not have been strictly a line of boundary, *Railroad Company* v. *Schurmeir*, 7 Wall. 272; *Hardin* v. *Jordan*, 140 U. S. 371, 380; *Horne* v. *Smith*, 159 U. S. 40; but it indicated that there was something which had stopped the survey, which limited the area of the land which the United States was proposing to convey, and left to subsequent measurements the actual determination of the line of separation between the land conveyed and that which the Government did not propose to convey. Generally, these meandered lines are lines which course the banks of navigable streams or other navigable waters. Here, it appears distinctly from the field notes and the plat that the surveyor, Rice, stopped his surveys at this "marsh" as he called it. These surveys were approved and a plat prepared, which was based upon the surveys and field notes, and showed the limits of the tracts which were for sale. The patents, referring in terms to the survey and plat, clearly disclose that the Government was not intending to and did not convey any land which was a part of the marsh. "The patent itself does not contain all the particulars of the survey, but the grant of the lands is recited to be according to the official plat of the survey of said lands, returned to the General Land Office by the surveyor general, thereby adopting the plat as a part of the instrument." *Hardin* v. *Jordan*, *supra*. In *James* v. *Howell*, 41 Ohio State, 696, 707, the Supreme Court of Ohio, speaking of these very patents and this marsh, said: "The 'meander' line along the southerly border of the marsh was, in fact, intended to be the boundary line of the fractional sections."

It may be that surveyor Rice erred in not extending his surveys into this marsh, but his error does not enlarge the title conveyed by the patents to the surveyed fractional sections. The United States sold only the fractional sections, received only pay therefor, an amount fixed by the number of acres conveyed, and one receiving a patent will not ordinarily be heard to insist that by reason of an error on the part of the surveyor more land was bought than was paid for, or than the Government was offering for sale.

·It may be true that under his contract, the requirements of the statute and the regulations of the land department, Rice should have extended his surveys to the shores of Lake Erie, but he did not do it; he stopped at the borders of this marsh, and the land department in effect approved his action.   He evidently thought that the marsh was to be treated as a body of water, a conclusion not unwarranted in view of the finding of excessive high water at that time, but a conclusion which other findings show was not correct.   And it may be remarked in passing that the letter of the statute would not limit the surveys to the shores of the lake, for section 2395 Rev. Stat. declares that surveys shall be by running lines at right angles "so as to form townships of six miles square, unless where the line of an Indian reservation or of tracts of land heretofore surveyed or patented, or the course of navigable rivers, may render this impracticable; and in that case this rule must be departed from no further than such particular circumstances require."

But Lake Erie is not an Indian reservation, nor a tract of land heretofore surveyed and patented, nor a navigable river. It is true section 2396, which provides how the boundaries and contents of the several sections, half sections and quarter sections of the public lands of the United States shall be ascertained, says, after stating the rule where all the corners are established, that "in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the water course, Indian boundary line, or other external boundary of such fractional township."

If this recognizes any other external boundary than that which is indicated in section 2395, it does not prescribe what that external boundary shall be; and if the land department treats either a marsh or a lake as such external boundary, who can declare that its action is void?

It is impossible to hold that the lower courts erred in the conclusion that this marsh was not to be regarded as land

continuously submerged, either under Lake Erie, a navigable lake, and in that case belonging to the State of Ohio, *Pollard* v. *Hagan*, 3 How. 212; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *McCready* v. *Virginia*, 94 U. S. 391, or under a pond or other similar body of non-navigable inland waters, and therefore generally the property of riparian owners. It was called a marsh by Rice, the first surveyor, is so styled on the plat, and the conditions as disclosed by the agreed statement indicate that it was a body of low swampy land, partly boggy and partly dry, sometimes subject to inundations from Lake Erie or the overflow of the adjacent streams, but not permanently covered with water.

Of course, if the fractional sections patented to Margaret Bailey did not border on some body of water there were no riparian rights, and if the conclusion of the trial court that this marsh was land (for swamp and boggy land is to be treated as land) was correct, then whatever changes may have come to the marsh — whether it became more or less subject to overflow — would not alter the fact that the rights of Margaret Bailey, the patentee, were limited to the very lands which were conveyed to her, and for which she paid, and did not extend over the meander line into the territory north.

But, it is urged, that the fact that a meandered line was run amounts to a determination by the land department that the surveyed fractional sections bordered upon a body of water, navigable or non-navigable, and that, therefore, the purchaser of these fractional sections was entitled to riparian rights; and this in face of the express declaration of the field notes and plat, that that which was lying beyond the surveyed sections was "flag marsh," or "impassable marsh and water." But there is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, Government or Indian reservation.

With respect to the contention that the character of this marsh, as it was found to have been, shows that it should have passed to the State of Ohio under the Swamp Land Act,

it is enough to say that the State of Ohio applied for it as such, that the application was denied, that this denial was made in 1852, that the land was never patented to the State, and without such patent no fee ever passed, *Michigan Land and Lumber Co.* v. *Rust,* 168 U. S. 589, that subsequently the land department treated it as land subject to its control, as public land of the United States, had it surveyed, sold and patented. Whatever claims the State of Ohio may have cannot be litigated in this suit. The legal title passed by the patent to the appellee's grantors, and that title is certainly good as against a stranger with no equities.

We see no error in the decree, and it is

*Affirmed.*