## THOMAS B. BISHOP CO. v. SANTA BARBARA COUNTY et al.

### No. 8532.

Circuit Court of Appeals, Ninth Circuit.

March 18, 1938.

Rehearings Denied April 22, 1938.

Sterling Carr, of San Francisco, Cal., and H. F. Prince and Gibson, Dunn & Crutcher, all of Los Angeles, Cal., for appellant.

Percy C. Heckendorf, Dist. Atty., C. C. Ward, and David S. Licker, all of Santa Barbara, Cal., for appellee Santa Barbara County.

Faries & McDowell, of Los Angeles, Cal., for appellees Chase et al.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appellant sued in ejectment to recover a parcel of land claimed to have been included in a patent from the United States, granting to its predecessor the Rancho Los Dos Pueblos in Santa Barbara County, California. This appeal was taken from an adverse judgment.

The trial court made findings, including as part of them the patent and the plat of survey of the Rancho. The evidence, aside from the patent and plat, is not before us, and thus the sole question presented is whether the conclusions of law and judgment are supported by the findings. The land involved is a sandspit, asserted by appellees to be part of the public domain. Santa Barbara County claims the sandspit by virtue of a lease granted by the Department of Interior pursuant to an act of Congress entitled "An Act To enable the board of supervisors of Santa Barbara County to maintain a free public bathing beach on certain public land." Public 92, 69th Congress, Act April 5, 1926, 44 Stat. 235.

Originally the Rancho Los Dos Pueblos was the subject of a Mexican grant, dated 1842, and approved by the Departmental Assembly three years later. In 1853 the claimant, one Nicholas A. Den, presented a petition for confirmation of the grant to a Commission set up to ascertain and settle private land claims under Act March 3, 1851, 9 Stat. 631. The Commission confirmed Den's title, and on appeal to the United States District Court the decree confirming the validity of the grant was affirmed. Thereafter the Rancho was surveyed and plat of the survey prepared under authority of the Surveyor General, and in 1877 United States patent was issued for the land embraced and described in the survey. The decree of confirmation entered by the United States court is recited in the patent. The Rancho is there described in general terms as "situate in the County of Santa Barbara, and known by the name of 'Dos Pueblos,' and is bounded by the seashore, by the high hills toward the mountains, by the 'Canada del Corral' and by the place called 'La Cochero' toward the Presidio of Santa Barbara. The land hereby confirmed is of the extent of three and one-half leagues within the boundaries."

As illustrative of the facts, so much of the plat as is necessary for this purpose is shown below:

near the ocean common to the grant in question and the Rancho Canada Del Corral, forming its westerly boundary. From this

The sandspit in controversy does not appear on the plat. It extends easterly from the place marked post "DP 2" partway across the mouth of the Estero, now known as Goleta Slough. In the findings it is described as being about a mile in length and of irregular width. It is about 600 feet wide at its widest point, and at its highest is about 7 feet above sea level. It contains between 20 and 25 acres. At its easterly end a tidal channel connects with the waters of the Pacific Ocean. This tidal channel extends into the Estero along the northerly side of the sandspit, and then runs northwesterly with its ordinary high tide line roughly paralleling the foot of a line of bluffs. The sandspit is entirely surrounded by tidal waters except for the westerly end where it joins the land. Except for temporary variations in length, breadth, and height, occasioned by storms and floods, this sandspit has existed substantially as described since at least as early as 1842.

Bluffs averaging 40 feet in height extend in a nearly continuous line along the shore of the ocean from the westerly limit of the Rancho to and including the southerly shore of the Estero. The field notes of the surveyor (they are set out in the patent) indicate that the survey commenced at a post marked "DP 1," which is a corner at or

starting point the survey extended easterly along the top of the bluffs fronting the ocean to the station marked "DP 2." The trial court found that the precipitous nature of the bluffs made it impractical to survey the actual boundary line of the ocean. It found that the survey line between the stations mentioned "was and is the meander line of the shore of the Pacific Ocean between these points." The foot of the bluffs on top of which post DP 2 of the survey was located runs in a nearly straight northwesterly line from a point on or near the ordinary high tide line of the Pacific Ocean to a point on or near the high tide line of the Estero. The base of the sandspit is at the foot of this line of bluffs.

It was found that, although prior to the issuance of the patent objection had been made to the survey line of the grant in respect of another part of the boundary, the patentee had made no objection to the fact that the survey line and plat failed specifically to include the sandspit in controversy. There are other findings which need not be mentioned, as they must yield to the crucial finding that "unless the sandspit was embraced in the grant and the patent, it was and is public land of the United States."

As a conclusion of law the trial court decided that the patent to the Rancho was

intended and is to be construed to make the ordinary high tide line of the Pacific Ocean the boundary of the grant from station 1 of the survey to a point on the high tide line of the ocean opposite the foot of the line of bluffs at the westerly end of the sandspit, and to make the ordinary high tide line of the Estero the boundary from a point at the westerly end of the sandspit to a point on the high tide line of the Estero opposite station 22 of the survey. It is concluded that the boundary of the grant extends along the foot of the line of bluffs, across the base of the sandspit, from the high tide line of the ocean to that of the Estero. Accordingly, it is held that the patented area does not include the sandspit.

The opinion of the trial court and the briefs refer to an examination made in 1929 by the General Land Office of conditions along the south boundary of the Rancho in question, in what is called the Lloyd's Scrip Case. The purpose of the examination was to ascertain if public land exists between the Rancho and the Pacific Ocean. The conclusions arrived at as a result of this investigation are embodied in a letter of Assistant Secretary Edwards of the Department of the Interior, addressed to the Commissioner of the General Land Office under date of February 4, 1930. The letter states that the lines of the patent survey were re-traced. It is pointed out that the surveyor, in running along the seashore, chose a line of least resistance along the top of the bluff rather than a consistent following of the mean high water mark of the ocean. The Department determined that there are approximately 246 acres of land between the official meander line and the mean high water mark, along the entire ocean frontage of about 10 miles. No evidence or suggestion of fraud on the part of the surveyor was found. It was concluded, as a result of this investigation, that the south boundary of the Rancho is the Pacific Ocean, and that there is no public land in the area in question. It does not appear whether any attention was given the sandspit here in controversy. It is stated in the departmental report that corner No. 2 (DP 2) was re-established in 1925 by Sidney E. Blout, United States Cadastral Engineer, who also established an auxiliary meander corner on the shore of the Estero, 2.46 chains distant, and another auxiliary meander corner at a point on mean high tide line on the shore of the ocean, 2.583 chains distant from the re-established corner DP 2. It would seem that

in determining the location of the latter post the trial court was guided by the work of Blout. While the findings do not indicate the precise location of the post, it is said by the court to be on top of the bluff. It would thus appear that the post is about midway between the shore of the ocean and the shore of the Estero, a little closer to the latter. This would place it about opposite the center line of the sandspit.

Between post No. 1 and post DP 2 of the survey as found in the patent there were 18 courses. The field notes describe the 18th course as running "thence North 65 degrees 30 minutes East 25 chains a large redwood post marked 'DP 2' Station on the shore of an arm of the sea or Estero." While, for his own convenience, the surveyor placed the post DP 2 on top of the bluff, it seems plain that the 18th course was intended to delineate the water line to a point on the shore of the Estero. The nineteenth course, running thence northwesterly, is described as being "along Estero on top of bluff." The trial court found, and we think properly, that the survey line between the point of commencement and station DP 2 is a meander of the shore of the Pacific Ocean. But since the sandspit lies between these points we think it necessarily follows, contrary to the conclusion reached below, that the survey was intended to meander the sandspit. The plat depicts the headland as fronted all about with the waters of the sea and Estero. While the various courses were run in straight lines from station to station, generally on top of the bluff, the true line of the survey was everywhere intended to be the water line. The sandspit was merely one of the numerous beaches or seaward projections lying outside the actual calls of the survey. Little if any more reason appears for excluding it from the patent than for the exclusion of any other projection. The sandspit was probably regarded as inconsequential. The plat and field notes do not indicate its presence. Its area was trifling, especially as compared with the total area of more than 15,000 acres covered by the patent. This is not a case of omission from a survey of land that ought to have been surveyed. Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A.,N.S., 107; Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402. It belongs rather in that numerous class where the smallness of the unsurveyed area and its apparent lack of value, coupled with the

difficulties of the terrain, point the reason for the failure of the surveyor to run his lines with greater particularity. Grand Rapids & Indiana R. Co. v. Butler, 159 U.S. 87, 15 S.Ct. 991, 40 L.Ed. 85; Whitaker v. McBride, 197 U.S. 510, 25 S.Ct. 530, 531, 49 L.Ed. 857. Compare United States v. Lane, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448; Mitchell v. Smale, 140 U.S. 406, 11 S. Ct. 819, 840, 35 L.Ed. 442; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 838, 35 L.Ed. 428; Anderson v. Trotter, 213 Cal. 414, 2 P. 2d 373. It is pointed out in Producers' Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 760, 59 L.Ed. 1330, that "facts and circumstances may be examined, and if they affirmatively disclose an intention to limit the grant to actual traverse lines, these must be treated as definite boundaries." Similar holdings are found in such cases as Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171, and De Guyer v. Banning, 167 U.S. 723, 17 S.Ct. 937, 42 L.Ed. 340. These cases are readily distinguishable. No facts or circumstances are here found sufficient to disclose affirmatively an intention to so limit the grant as to exclude the sandspit.

Appellees appear to concede that seaward projections beyond the lines of the survey should properly be considered as part of the patented area, but they insist that since the sandspit extends in an easterly direction, parallel to the coast line, it was not so included. The water boundary rule, however, takes no account of directions. The further contention is made that, since we are dealing with a Mexican grant, the actual lines of the survey must be taken as the true boundary. This contention is at war with the findings of the trial court, and appellees have accepted these as correct. A principal difficulty with the decision is that, in respect of the area in controversy, neither the water boundary rule nor the rule contended for by appellees was applied. The decision abandons the water line as a boundary on one side of the sandspit and resumes it again on the other. Between these points the boundary was determined to be, not the line of the survey, nor yet the water line, but the foot of the bluffs on top of which the line was run. We are unable to reconcile the holding with the familiar rules applied in the decided cases.

■ The order of confirmation, which is recited in the patent, describes the grant as bounded by the seashore and by the high hills toward the mountains. The confirmation was of a tract with designated boundaries, and included all the land within those boundaries. United States v. Hancock, 133 U.S. 193, 10 S.Ct. 264, 33 L.Ed. 601. The Act of Congress of July 1, 1864, 13 Stat. 334, § 7, requires the Surveyor General, "in making surveys of the private land claims finally confirmed, to follow the decree of confirmation as closely as practicable whenever such decree designates the specific boundaries of the claim." The findings and the plat indicate that the surveyor in the instance before us had in mind the boundaries of the claim as specified in the decree of confirmation, and that he undertook to perform the duty imposed upon him of following the decree as closely as practicable.

■ A survey of the seaward side of this grant was not necessary to determine the southerly boundary, nor was it run for this purpose. As said in Whitaker v. McBride, supra: "A meander line is not a line of boundary, but * * * a means of ascertaining the quantity of land in the fraction which is to be paid for by the purchaser." And as stated in St. Paul & P. Railroad Co. v. Schurmeir, 7 Wall. 272, 286, 19 L.Ed. 74, the "meander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser."

■■ It would be unprofitable to review further the wealth of cases on the general subject. While it is contended by appellee Santa Barbara County that in the construction of Spanish and Mexican grants the actual lines run by the surveyors are to be considered as the true boundaries, irrespective of other circumstances, we are unable to agree that the controlling authorities so hold. Compare Coburn v. San Mateo County, C.C., 75 F. 520; Jones v. Martin, C.C., 35 F. 348. Where reason and common sense dictate its application, the so-called water boundary rule has been as freely applied to patents based on these grants as in situations involving grants of public lands of the United States.

At the time of the commencement of this action Hon. Ray Lyman Wilbur, then Secretary of the Interior, was named as a party defendant. Subsequently he retired, and in March, 1933, Hon. Harold L. Ickes succeeded him as secretary. On March 26,

1935, some months prior to the entry of findings and judgment, it was stipulated that Secretary Ickes be substituted as defendant in the action, in the place of his predecessor. This stipulation was signed by the attorneys for the plaintiff and the attorneys for the defendants. The United States Attorney for the Southern District of California signed it as attorney for Secretary Wilbur and Secretary Ickes. On this stipulation the court ordered the substitution.

■■ It is suggested in this court by the United States Attorney (who, incidentally, has presented a vigorous brief on the merits on behalf of the United States) that the action abated as to the Secretary of the Interior because no substitution was made as required by the Act of February 13, 1925, c. 229, § 11, 43 Stat. 936, 941; 28 U.S.C.A. § 780. Section 11 of that act, so far as here important, provides that where, during the pendency of an action brought by or against an officer of the United States, and relating to the present or future discharge of his official duties, such officer dies, or otherwise ceases to hold such office, it shall be competent for the court in which the action is pending to permit the cause to be continued and maintained by or against the successor in office of such officer, "if within six months after his death or separation from the office it be satisfactorily shown to the court that there is a substantial need for so continuing and maintaining the cause and obtaining an adjudication of the questions involved." As was held in Fix, Collector v. Philadelphia Barge Co., 290 U.S. 530, 54 S.Ct. 270, 271, 78 L.Ed. 481, the act is purely remedial. Failure to comply with the statute does not destroy the right, and the cause of action may survive, "depending upon its nature and the applicable rule." We think the cause of action here, insofar as it may be made the basis of a suit against the Secretary of the Interior, survived the failure to comply with the statute in respect of the substitution of officers. No reason occurs to us why the present Secretary of the Interior could not, as he did, voluntarily become a party to the suit with the consent of all parties. This he might do, we think, independent of the statute providing for substitution. Compare Farrar & Brown v. United States, 3 Pet. 459, 7 L.Ed. 741. It seems sufficient to hold that the Secretary of the Interior is properly a party to the action by his own choice.

The judgment is reversed.

### On Petitions for Rehearing.

■ Appellees have petitioned for a rehearing, insisting earnestly that we have disregarded the findings of the trial court. Particularly is it insisted that we have ignored the finding that station DP 2 is a corner or turning point of the survey, marking the easterly limit of the grant.

The petitions display an apparent misunderstanding of what was held. Course 18 (as well as all previous courses from the point of commencement to station DP 2) was found by the trial court to be, not a line of boundary, but a meander of the shore of the ocean. Course 19 ("along Estero on top of bluff") was found to be, not a line of boundary, but a meander of the shore of the Estero. These two traverse lines are the only ones material to the controversy, and they are controlling. Since both were found to be, not boundaries, but meanders of the sea and the Estero, the conclusion is inescapable that one or the other, or both, were intended to meander the sandspit. The conclusion of law reached below, that the boundary at this place was the foot of the bluffs along the westerly terminus of the sandspit, we believed to be without support in reason or authority and plainly in conflict with the findings.

Since it was found that courses 18 and 19 depict the water line, it is apparent that all land lying between them and the shores of the sea and Estero was included within the sweep of the survey. The specific findings leave no alternative but to conclude that the sandspit is part of the grant, for the patent admittedly embraces all land delineated by the survey. The fact that post DP 2 was a corner or turning point is of no significance.

Petitions denied.