**Willis W. RITTER, Appellee,**

v.

**Rogers C. B. MORTON, Secretary of the Department of the Interior, et al., Appellants.**

No. 73–1770.

United States Court of Appeals, Ninth Circuit.

April 4, 1975.

Rehearing and Rehearing En Banc Denied June 5, 1975.

Larry G. Gutterridge (argued), U. S. Dept. of Justice, Washington, D. C., for appellants.

Donald B. Holbrook (argued), Jones, Waldo, Holbrook, Salt Lake City, Utah, for appellee.

Before DUNIWAY and KILKENNY, Circuit Judges, and SWEIGERT,* District Judge.

## OPINION

PER CURIAM:

This case involves the ownership of three islands located in the Snake River in Idaho. The action was brought by appellee, and jurisdiction was claimed under 5 U.S.C. §§ 701–706 (Administrative Procedure Act), 28 U.S.C. §§ 1361 (suit compelling officer to perform duty) and 2201, 2202 (declaratory judgment). After a full presentation of the evidence, the district court found for appellee. We reverse the judgment of the lower court and affirm the decision of the Secretary.

## FACTS

Appellee is the owner of "Thousand Springs Farm," which extends for three miles along the east bank of the Snake River in Gooding County, Idaho. His ownership of the land results from a series of conveyances dating from the original government patents. The islands in dispute are in Section 17 of Township 8 South, Range 14 East of the Boise Meridian, and are located in the river immediately south and west of the principal area of appellee's farm.

The United States caused a survey of the township to be made in August and

---

* The Honorable William T. Sweigert, Senior United States District Judge for the Northern District of California, sitting by designation.

September of 1893. An official plat of the township, based on the surveyor's field notes, was drawn and approved by the Surveyor General for Idaho in May, 1895. The relevant portion of this plat is shown in Diagram A. In February, 1896, a patent was issued under the Homestead Act to Polina Lewis, a predecessor in interest of appellee. The patent covered " . . . the Southeast Quarter of the Southeast Quarter and the West Half of the Southeast Quarter, and Lots Five and Eight in Section Seventeen, . . . containing 170.40 acres." According to the official plat, fractional Lots 5 and 8 contained 16.80 and 33.60 acres respectively, with 120 acres in the remainder of the patented area. The lots bordered on the river.

The surveyor's field notes make no mention of the disputed islands which, in fact, were located alongside Lots 5 and 8. The surveyor's description of the river's meander line on the east bank specifically mentions crossing Sand Creek twice, thus apparently remaining east of the islands. The plat shows only a significant bulbous widening of the river where the islands in fact were located. This contrasts sharply with the survey and plat of Section 20 to the south, in which an island is described in the field notes and drawn in the plat. Another contrast is evident with Section 8 to the north, wherein the meander line clearly is shown to be on the west side of an island-like piece of land separated from the adjacent basalt cliffs by a stream created by the flow of Thousand Springs.

The Department of the Interior did not conduct a survey of the disputed islands until 1955. They were then designated Lots 9, 10 and 11 and measured 8.99, 1.29 and 0.84 acres respectively. A plat based on the 1955 field notes was filed in 1959, the relevant portion of which is contained in Diagram B. The most recent plat, current to September, 1971, shows Lots 5 and 8 still to be 16.80 and 33.60 acres respectively, as they were in the 1895 plat. The relevant portion of the latest plat is pictured in Diagram C.

In June, 1959, appellee was notified by the Department of the Interior that the previously omitted islands are, by virtue of the new survey, " . . . public lands of the United States open to entry and selection under the public land laws. . . . " Other material facts follow.

## PROCEEDINGS BELOW

When the Department later made known its intention to transfer title in the islands to the State of Idaho, appellee commenced an administrative action under the Color of Title Act, 43 U.S.C. § 1068, which action was ultimately denied by the appellant Secretary of the Interior. This action in the district court followed. Appellee asked that the administrative action be reversed or that, alternatively, the appellant officers of the United States be restrained from interfering with his title, use, and possession of the claimed islands.

The district court made, *inter alia*, the following findings of fact:

—"The field notes and survey plat described the western boundary of Lots 5 and 8, Section 17, as the meander line of the Snake River."

—The disputed islands, according to expert testimony, " . . . constitute a flood plain of the Snake River which plain was built during flood stages by the deposit of layer upon layer of silt and very fine sand which are the common sediments that the Snake River has carried."

—"[T]he subject lands once formed a peninsula which was connected with the mainland, now lots 5 and 8. The subsequent separation of the subject lands from Lots 5 and 8 was due to the flow of Sand Springs Creek and not the action of the Snake River."

—"The channel of the Snake River in 1893 was to the west of the subject lands and the high and low marks of the Snake River are to the west of the subject lands. *The meander line of the Snake River in 1893, at the time of the survey of Lots 5 and 8 was on the west boundary of the subject islands.*" [Emphasis supplied.]

—"There was no gross error or fraud in connection with the survey of 1893."

Among its conclusions of law, the district court held that the action was in the nature of one " . . . to restrain the defendants from interfering with the plaintiff's use and possession of lands patented and lawfully conveyed to him." Accordingly, it concluded that the action was not barred by the doctrine of sovereign immunity and that it had jurisdiction. It found appellee to be the owner of the islands because they " . . . are east of the water course of the Snake River which constitutes the actual boundary of the land conveyed by the patent. . . . " In finding for appellee and enjoining appellants from interference with the appellee's title to the islands, the court found it unnecessary to determine the administrative appeal under the Color of Title Act.

### ISSUES ON APPEAL

The questions raised by the parties and presently before this court are:

1. Did the district court err in concluding that this action is not barred by the doctrine of sovereign immunity?

2. Is federal or Idaho law controlling on the boundary determination issue?

3. Did the district court apply the proper rules of law in determining the placement of the boundary and the ownership of the islands?

4. Was the district court clearly erroneous in its factual findings that the disputed islands were east of the Snake River's boundary and meander line?

### THE SOVEREIGN IMMUNITY ISSUE

■ Though under attack in other areas of the law, the doctrine of sovereign immunity is still very much alive in suits involving land title disputes. An uncontested suit against a federal officer which is, in substance, a suit against the United States has traditionally been jurisdictionally barred by sovereign immunity. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The rule was restated and clarified in Malone v. Bowdoin, 369

U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962), involving a common law ejectment action against an officer of the Forest Service to prevent him from occupying land under claim of title. Citing *Larson*, the Court in *Malone* stated:

"[T]he action of a federal officer affecting property claimed by a plaintiff can be made the basis of a suit for specific relief against the officer as an individual only if the officer's action is 'not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.'" 369 U.S. at 647, 82 S.Ct. at 983.

■ Here, appellee made affirmative allegations of illegal and unconstitutional conduct by appellant officers. However, the bare allegations cannot lift the jurisdictional bar if the action is, in actuality, one to quiet title against the United States.

We have applied *Malone* in two recent instances, Andros v. Rupp, 433 F.2d 70 (CA9 1970), and Armstrong v. Udall, 435 F.2d 38 (CA9 1970). *Andros* was an action against a U.S. forest supervisor to restrain him from interfering with plaintiff's use and possession of the land. The distinguishing feature for our purposes here, however, is that record title was stipulated as being vested by patent and mesne conveyances in the plaintiff, not the United States. In our case, there is no such agreement, and in fact, the title ownership is the sole point of dispute. Appellee's reliance on this case is misplaced.

Further clarification comes in Armstrong v. Udall, *supra*, an action to enjoin the Secretary of the Interior from claiming title to property held by plaintiff and originally entered by plaintiff's predecessor, and to require the Secretary to execute patents and titles to the land. Its similarity to the instant case is readily apparent, and we consider the rule it states to be controlling. Unlike *Andros*, the title in *Armstrong* was fully contested and at the center of the dispute. As in our case, the Secretary in *Armstrong* claimed that the plaintiff was occupying

public land owned by the United States and separate from that covered by the patent based on the original survey. We held that it was the task of the district court to determine from the evidence whether the land occupied by plaintiff was a part of the land entered by the claimed patentee and described in the patent originally issued to him. If this were determined adversely to plaintiff, then the apparent title would be in the United States and the action would be one against the United States without its consent and, consequently, jurisdictionally barred by sovereign immunity. *Id.* at 41. We there concluded that the district court should make a factual determination of whether the case was controlled by *Malone* (title in the United States, immunity) or *Andros* (title in plaintiff, no immunity) by deciding wherein apparent title rested.

*Armstrong* recognizes that in title dispute cases the issue of sovereign immunity and the ultimate merits of a plaintiff's claim are intimately interconnected. For all practical purposes, the former cannot be resolved without determining the latter. In the instant case, we hold, as explained in detail below, that the district court erred in its factual and legal determination that the disputed islands were included within the boundaries of the patent to appellee's predecessor. Accordingly, it also erred in its dependent conclusion that the suit was not barred by sovereign immunity.

### THE CHOICE OF LAW ISSUE

■ Although appellee contends to the contrary, the rule is clear that federal law governs as to the construction of a patent and the quantum of the premises which it conveys. Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967); United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935). This rule was stated thusly in Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 22, 56 S.Ct. 23, 29, 80 L.Ed. 9 (1935):

"The question as to the extent of this federal grant, that is, as to the limit of the land conveyed . . ., is necessarily a federal question. It is a question which concerns the validity and effect of an act done by the United States; it involves the ascertainment of the essential basis of a right asserted under federal law."

*See also* Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 320–21, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); United States v. Schwarz, 460 F.2d 1365 (CA7 1972); United States v. Boyd, 458 F.2d 1252 (CA6 1972). The same rule applies to a patent granted after statehood is achieved. United States v. Severson, 447 F.2d 631 (CA7 1971). Accordingly, Federal—not Idaho—substantive law governs us in determining the boundary issue and the extent of the patent.

### THE APPLICABLE RULES OF LAW IN THE BOUNDARY ISSUE

Of great importance in this case is the legal effect to be given to the survey's meander line on the river's east bank. Early decisions held that a meander line is generally not to be used as the strict boundary of a tract, but is to be employed in defining the sinuosities of the banks of the stream and as a means of ascertaining the quantity of land in a fraction for sale and the amount to be paid. Whitaker v. McBride, 197 U.S. 510, 25 S.Ct. 530, 49 L.Ed. 857 (1905); Railroad Company v. Schurmeir, 74 U.S. (7 Wall.) 272, 19 L.Ed. 74 (1868); Thomas B. Bishop Co. v. Santa Barbara County, 96 F.2d 198 (CA9 1938), cert. denied, 305 U.S. 623, 59 S.Ct. 84, 83 L.Ed. 398. However, the boundary uses of a meander line in special circumstances were expanded and clarified in Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1899). That case involved lakefront property and a disputed marsh outside the meander line, but arguably still within the boundary. The Court, while noting that a meander line is ordinarily not strictly a line of boundary, found special circumstances which dictated otherwise. The surveyor had stopped his survey at what he called a "marsh," which was excluded from the official plat. The Court held that while the sur-

veyor may have erred in not extending the survey, " . . . his error does not enlarge the title conveyed by the patents to the surveyed fractional sections." *Id.* at 306, 20 S.Ct. at 127. It was clear from the circumstances that the government did not intend to convey any property beyond the meander line.

The "special circumstances" exception was restated in Producers Oil Co. v. Hanzen, 238 U.S. 325, 339, 35 S.Ct. 755, 760, 59 L.Ed. 1330 (1915):

"[F]acts and circumstances may be examined and if they affirmatively disclose an intention to limit the grant to actual traverse [meander] lines, they must be treated as definite boundaries." [1]

Other cases considering the "special circumstances" exception and rejecting it on factual grounds include United States v. Lane, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448 (1923), and Thomas B. Bishop Co. v. Santa Barbara County, *supra, Lane,* upon which appellee heavily relies, is readily distinguishable. There, the plat mentioned in the patent represented the lake as the boundary. The Court emphasized that the survey, taken as a whole, with the exception of two large tracts, followed fairly accurately the contour of the lake. It went on to say that the evident purpose of the survey was to include in it all the land to the water's edge. The water's edge in *Lane* included the disputed area. Here, the water's edge excludes the islands. *Lane* thereby favors appellants, rather than appellee.

Additionally, *Lane* mentions certain factors which indicated an intention to include extra land within the boundary. Noting an absence of fraud or palpable mistake, it added that at the time of the survey the land had little value, was in a wild and remote area, and presented difficulties in surveying which would outweigh the expenditure of time and money for a more precise rendition. 260 U.S. at 665, 43 S.Ct. 236.

These factors were reiterated in Thomas B. Bishop Co. v. Santa Barbara County, *supra,* a case involving the seaward projection of a sandspit beyond the survey's meander lines. The previously mentioned factors of relative size, value, terrain difficulty, and the lack of fraud were found to be sufficient to overlook the placement of the meander line and to include the sandspit within the original patent.

It should be emphasized at this point that these are all merely *factors* to be considered in evaluating the weight to be given to the position of a meander line *vis-a-vis* the boundary. Factual circumstances differ from case to case, and *all* the facts must be first considered individually, and then considered *in their totality.*

We now turn to the leading case of Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1913). Aside from the size of the island and its distance from the bank, *Scott* is almost directly in point. It also involved disputed title to an island in the Snake River. The land had been surveyed in 1868, and the surveyor's field notes and the official plat placed the meander line, as here, on the edge of the fractional sections. However, the island was mentioned in neither the field notes nor the plat. Even though it was the duty of the surveyor in *Scott* to note and locate the island's presence, and even though the evidence showed that it had existed at that time, he failed to do so. The island was clearly outside the meander line and between the fractional lots and the thread of the stream. Nevertheless, " . . . the error in omitting it from the survey did not divest the United States of the title, or interpose any obstacle to surveying it at a later time." *Id.* at 241–42, 33 S.Ct. at 243. The Court found the island's omission and the fact that it had been fast, dry land at the time of the survey and sufficiently separated from the

---

1. *See also* United States v. 100 Acres of Land, Etc., Marin County, Cal., 468 F.2d 1261, 1264 n.1 (CA9 1972), cert. denied, 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973), stating that " . . . a meander line does not delimit a grant where the land is bordered by water *unless* special evidence is presented to show an intent to use the meander line as a boundary of the patented land. . . ." [Emphasis in original.]

shore, to be the type of circumstances which would warrant the meander line becoming a strict boundary. We find Scott v. Lattig to be directly applicable to our case, both for its legal statements and for its factual similarity.[2]

Just as in Scott v. Lattig, the original surveyor in the instant case was specifically instructed to note the existence of any islands. Manual of Surveying Instructions for the Survey of the Public Lands of the United States and Private Land Claims, p. 34 (1890). Also, the governing statute demanded accuracy, with departure therefrom " . . . no further than such particular circumstances require." U.S.Rev.Stat. § 2395(1) (2d ed.). Here, there is no evidence or claim of fraud. The record is clear that the islands in dispute did, in fact, exist at the time of the 1893 survey. There is no evidence to the contrary.

■ In determining boundaries in any land patent case, special weight must be given to the precise description of the land contained in the surveyor's field notes and the official plat. Jeems Bayou Club v. United States, 260 U.S. 561, 564, 43 S.Ct. 205, 67 L.Ed. 402 (1923). One of the purposes for accuracy in field surveying and platting of uncharted lands was to assure preciseness in descriptions in land patents.[3] It is undisputed that the 1896 patent was based on the results of the 1893 survey and the 1895 plat. Accordingly, we must give great weight to the fractional lots' boundary line as revealed in the survey and as shown in the plat.[4]

For the same reason, particular attention must be paid to the precise acreage computation in the plat. In United States v. Boyd, supra, at 1254, the plat stated that the premises contained 29.50 acres, and the Court noted that "[i]t did not say more or less." The plat's limitation was taken to show that the patent conveyed only 29.50 acres, which ended at the lake's edge and thus could not include any outside land. Also, in Scott v. Lattig, supra, at 240, 33 S.Ct. 242, the fractional sections were described as containing a specified number of acres from which the disputed island was excepted.

■ Here, the patent and accompanying plat granted appellee's predecessor an exact number of acres in Lots 5 and 8. This evidence is highly persuasive in determining whether the islands were intended to be conveyed therewith.[5]

In summary, there are a number of legal principles and the admitted facts which we must take into consideration in determining the disputed shoreline boundary in the present case—the placement of the meander line and any attendant circumstances showing it to be intended as the strict boundary, the precise description of the land in the surveyor's field notes and the plat, and the exact acreage allotment listed. We emphasize again the need to view the factual circumstances in their totality. Having stated these controlling rules, we evaluate the district court's factual findings.

---

**2.** The principle enunciated in Scott v. Lattig was most recently restated in Texas v. Louisiana, 410 U.S. 702, 713, 93 S.Ct. 1215, 1221, 35 L.Ed.2d 646 (1973): "Title to islands [in navigable waterways] remains in the United States, unless expressly granted along with the stream bed or otherwise. This was the express holding of Scott v. Lattig. . . ." See also United States v. Severson, supra.

**3.** The dependence of government land sales on the accuracy of official surveys and plats prepared therefrom is contained in U.S.Rev.Stat. § 2395 (2d ed.), governing the rules of survey, in effect at the time of the 1893 survey.

**4.** See also United States v. Boyd, supra. The Court in First Nat'l. Bank of Decatur, Neb. v.

United States, 59 F.2d 367 (CA8 1932), referring to plat and survey incorporation into the patent, held that "[t]he government survey creates and does not merely identify sections, subdivisions, and boundaries, and this survey, the government plat, and the government patent are not open to challenge by collateral attack." [Citing Russell v. Maxwell Land Grant Co., 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971 (1895), and Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566 (1888)].

**5.** "Each section or subdivision of section, the contents whereof have been returned by the surveyor-general, shall be held and considered the exact quantity expressed in such return . . . ." U.S.Rev.Stat. § 2396(3) (2d ed.).

## THE STANDARD OF REVIEW

■ As in reviewing any district court's factual findings, we recognize our obligation to view the record in the light most favorable to appellee. W. S. Shamban & Co. v. Commerce & Industry Ins. Co., 475 F.2d 34 (CA9 1973). We are, of course, guided by the "clearly erroneous" standard of Rule 52(a), F.R.Civ.P., as construed in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), where it is said:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." [Emphasis supplied.]

See also County of Ventura v. Blackburn, 362 F.2d 515 (CA9 1966).

■ We may regard a finding as clearly erroneous not only if it is without adequate evidentiary support, but also if it was induced by an erroneous view of the law. United States v. Singer Mfg. Co., 374 U.S. 174, 194–95, 83 S.Ct. 1773, 10 L.Ed.2d 823 n. 9 (1963); Rowe v. General Motors Corp., 457 F.2d 348 (CA5 1972). Therefore, if we conclude that the district court derived its factual findings and ultimate conclusions of law from the application of improper legal standards to the facts, we must reverse. Specifically, this must occur here if it is apparent that the district court ignored or gave insufficient weight to the important rules and factors detailed above for settling fractional boundary disputes. Also, we naturally must reverse if the admitted facts are overlooked or misinterpreted.

## ANALYSIS OF THE DISTRICT COURT'S FINDINGS OF FACT

■ We must take immediate issue with the district court's finding (Number 8) that "[t]he meander line of the Snake River in 1893, at the time of the survey of Lots 5 and 8 was on the west boundary of the subject lands." The surveyor's field notes give sufficient detail of the meander line of Lots 5 and 8 to place it clearly to the east of any islands in the river at that point. The notes, proceeding south to north, speak of crossing the falls of Sand Creek, then bearing *east*, reaching a rocky point, and finally crossing *another* branch of Sand Creek. Aerial photographs and plats in evidence clearly indicate that the south branch of Sand Creek exits from Section 17 at a point directly across from the middle of the largest of the three islands, Lot 9. The plat, based on the 1893 field notes, clearly shows the south branch of Sand Creek entering the Snake at the approximate center of Lot 5. This confluence would be directly east of the approximate center of the large island now known as Lot 9. The north fork of Sand Creek flows into the river at a point to the north of Lot 9 at a narrowing of the river. When these facts are considered, along with the undisputed fact that the islands were in existence in 1893, it can only be concluded that the original survey placed the meander line along the bank to the east of the islands. These facts alone demonstrate that the trial judge was clearly erroneous in his finding that the channel of the Snake River in 1893 was to the west of the subject islands and that the meander line of the Snake River at that time was on the west boundary of the islands. To find otherwise would have Sand Creek's south fork intersecting Lot 9 and flowing into the river on the west side of the island. Such a finding would nullify the undisputed facts before us.

Having established the proper placement of the meander line, the task remains of assessing its factual significance in relation to the omitted islands. We commence by noting again that there is no evidence of fraud in the surveyor's failure to note the islands' existence. He did describe a much smaller island west of the meander line in Section 20, but why did he fail to do so in Section 17? He placed a large island-like piece of land in Section 8 squarely east of the right bank's meander line, but why did he not do likewise in Section 17?

In all probability, he intended to return and survey the islands at a later date. Here, we must consider the "special circumstances" discussed above in Niles v. Cedar Point Club, Scott v. Lattig, and United States v. Lane.

On first impression, one might excuse the islands' omission due to their relative smallness. However, the small island south in Section 20—less than five acres in size—was included in the survey, while the three disputed islands—with the largest being almost nine acres—were excluded. The inconsistency is apparent. The surveyor could hardly have considered them too small. Accordingly, we find the islands' relative overall size to be that which might call for their exclusion from the boundary of Section 17 and their reservation for a later survey. Scott v. Lattig, supra, at 241–42, 33 S.Ct. 242. While not determinative in itself, this is a major factor which must be considered.

Lane, supra, at 664, 43 S.Ct. 236, also speaks of the omitted land's locality, remoteness, and value as additional factors, along with the existence of any difficulties out of proportion to any possible gains in surveying, as factors which might excuse the islands' survey while including them within the fractional lots. These factors do not appear to be applicable here. At the time of the survey, as mentioned in the field notes, the areas along the river were already being settled, including Section 17 by Polina Lewis and others. By appellee's own admission, the islands were continuously used for agricultural purposes, principally as grazing land, even at the time of the 1893 survey, so they could hardly have been of such slight value as to be taken for granted. There is no evidence to indicate that the islands were so wild, remote, and dangerous that the surveyor intended implicitly to include them within Lots 5 and 8 without even mentioning them, much less surveying them.

We must also recognize the precise description of Section 17 contained in the plat, realizing the importance of the plat and its field notes in limiting the amount

of the patent. Jeems Bayou Club v. United States, supra; United States v. Boyd, supra. Physically, the plat is persuasive in showing a noticeable widening of the river at the exact spot where the island should be, and a clearly defined meander line to what would be their east. Again, the contrast with the small island included in Section 20 is apparent. Mathematically, the plat is persuasive in precisely limiting Lots 5 and 8 to 16.80 and 33.60 acres respectively, computations which coincide with the latest approximation of their sizes. The three islands, now estimated to be 11.12 acres in toto, were clearly present in 1893, but obviously could not have been part of the previously delimited 16.80 and 33.60 acres in Lots 5 and 8. The patent conveyed a set number of acres—no more and no less.

■ The district court placed great reliance upon expert testimony concerning the manner in which the islands were formed. The court concluded that the islands were once morphologically attached to the bank as a peninsula, which gradually became dissected from the bank through the action of the "copious springs flowing from the adjacent basalt cliffs." This may be true, but it is irrelevant in the face of the uncontroverted evidence that the islands did, in fact, exist at the time of the 1893 survey. How they came into existence and how long before 1893 does not overcome the fact that in that year they were fully separated from the river bank and west of the meander line on the east side of the Snake.

### CONCLUSION

■ Considering all the above circumstances in their totality and viewing the record as a whole, we are led to the conclusion that the district court was clearly erroneous in its finding of fact that the islands were intended to be included in the patents conveying Lots 5 and 8. The district court also erred in its conclusion of law that the patent, through mesne conveyances, conveyed the islands to appellee. Title to the is-

lands was and remains in the United States.

It follows that the district court also erred in concluding that this is an action to restrain appellants from interfering with appellee's use and possession of lands patented and lawfully conveyed to him, over which it would have jurisdiction.

The decision of the Secretary of the Interior under the Color of Title Act is affirmed. The judgment of the district court is reversed and appellee's action for an injunction is dismissed.

It is so ordered.

Diagram A
[Plat of 1895]
[Circle denotes area of disputed islands.]

Diagram C
[Plat current to 1971]

Diagram B
[Plat of 1959]

[Circles denote area of disputed islands.]

Diagram A-1
[Enlargement of Section 17 showing con‑
fluence of Sand (Springs) Creek and
Snake River, 1895 Plat]