270 So.2d 390 (1972)
William Edward CONNERY, Appellant,
v.
PERDIDO KEY, INC., Appellee.
No. R-62.
District Court of Appeal of Florida, First District.
November 28, 1972.
Rehearing Denied January 8, 1973.
*391 Richard P. Warfield, of Levin, Warfield, Graff, Mabie & Rosenbloum, Pensacola, for appellant.
Edward T. Barfield, of Hahn, Reeves & Barfield, Bert H. Lane and C. Roger Vinson, of Beggs, Lane, Daniel, Gaines & Davis, Pensacola, for appellee.
WIGGINTON, Judge.
Defendant has appealed an adverse final judgment rendered in an action in ejectment which was tried by the court without a jury. The facts are not in dispute and the sole question resolves itself into one of law.
This action involves a relatively small island situate southwest of Pensacola in the Gulf of Mexico, known as Perdido Key. It was originally a narrow sandspit extending in an easterly and westerly direction parallel to the coastline. The island was surveyed in 1908 for the United States General Land Office by one Charles M. Pidgeon, the official plat of which formed the basis of the conveyance of the island from the United States to plaintiff's predecessor in title. The land comprising the island is described on the official government land office plat by government lots located in specifically described fractional sections, townships, and ranges. The official *392 plat shows the land so described to be bordered on the north by the waters of Grand Lagoon and on the south by the Gulf of Mexico. The plat does not reflect the existence of any land mass, swamp, or marsh on or around the island which was not included within the survey.
A private survey of Perdido Key was made in 1966 by one Robert D. Hinson. This survey followed the calls and distances recorded in the field notes of the Pidgeon survey made in 1908. The plat of the island prepared by Hinson as a result of his survey shows that a substantial portion of the southern part of the island bordering the Gulf of Mexico and contained within the meander traverse lines of the Pidgeon survey is now underwater. Hinson's plat further reflects the existence of a strip of land which now lies north of and adjacent to the northern meander traverse line of the Pidgeon survey between that line and the waters of Grand Lagoon.
Plaintiff's claim of title is based squarely upon the patent from the United States to its predecessor in title according to the official government land office plat drawn in accordance with the Pidgeon survey of 1908. Plaintiff contends that this grant conveyed to its predecessor in title portions of the island which, according to the Pidgeon survey and official plat, are bordered by the waters of Grand Lagoon on the north and the Gulf of Mexico on the south, which bodies of water form the natural boundaries of the island irrespective of the calls and distances of the traverse lines contained in the field notes of the Pidgeon survey. Defendant makes no claim to that portion of the island lying within the calls and distances of the meander traverse lines reflected by the original field notes of the Pidgeon survey but contends that the narrow strip of the island lying north and adjacent to the land described in the Pidgeon field notes was not included within the Pidgeon survey and, therefore, constitutes unsurveyed lands owned by the United States Government for which defendant has filed a homestead application and which he has occupied since September, 1967.
In the trial court's findings of fact and conclusions of law, it is held that the waters of the Gulf of Mexico and of Grand Lagoon constitute the natural boundaries of the island and that the traverse meander lines contained in the field notes of the Pidgeon survey do not control the quantity of land claimed by plaintiff. Based upon such findings and conclusions, judgment was entered in favor of plaintiff and against defendant.
From an examination of the record it appears without dispute that the original government land office plat of Perdido Key prepared in accordance with the 1908 Pidgeon survey describes the island as consisting of certain numbered government lots lying in identified fractional sections, townships, and ranges. The government lots delineated on the plat extend to the waters of Grand Lagoon on the north and the Gulf of Mexico on the south. The plat does not reflect any lands on the island not included within the survey and within the lots shown thereon. It affirmatively appears that no land mass, swamp, or marsh lies between the northern boundary of the lots shown on the plat and the waters of the Lagoon. An examination of the plat affirmatively establishes that the United States Government's interpretation of the survey and field notes made and prepared by Pidgeon in 1908 included the entire island as it then existed, and the patent to a portion of the island issued by the United States to plaintiff's predecessor in title on September 2, 1926, effectively conveyed title according to the official plat. An examination of the Pidgeon field notes of his survey made in 1908 reveals repeated references in practically every one of the calls to points at which the traverse lines of the survey intersect and run with the meanders of the waters of Grand Lagoon on the north and of the Gulf of Mexico on the south. These field notes affirmatively establish that the northern boundary of the survey meandered the waters of Grand Lagoon *393 along the northern shore of the island and the southern boundary of the survey meandered the waters of the Gulf along the southern shore.
The field notes prepared and filed by surveyor Pidgeon stated that there are no agricultural lands in the fractional townships surveyed by him and that it consists largely of only a sandspit subject to overflow and the contour of the beach subject to change.
Surveys of public lands conducted by the general land office of the United States were and are made in accordance with instructions contained in a manual issued in 1865 entitled "A Manual of Surveying Instructions to Regulate the Field of Operation of Deputy Surveyors." This manual was reissued in 1871 and revised in 1881, 1890, 1894, 1902, 1930, and 1949.[1] The purpose and effect of meander lines run by government surveyors acting on behalf of the general land office are succinctly explained in the manual of instructions as follows:
"All navigable bodies of water and other important rivers and lakes (as hereinafter described) are to be segregated from the public lands at mean high-water elevation. The traverse of the margin of a permanent natural body of water is termed a meander line. In original surveys, meander lines are not run as boundary lines but for the purpose of defining the sinuosities of the bank or shore-line, and for ascertaining the quantity of land remaining after segregation of the water area.
* * * * * *
"Numerous decisions in the United States Supreme Court and many of the State courts assert the principle that meander lines are not boundaries defining the area of ownership of tracts adjacent to waters. The general rule is that meander lines are not run as boundaries, but to define the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey, the stream, or other body of water, and not the meander line as actually run on the ground, being the boundary. When by action of water the bed of the body of water changes, high water mark changes and ownership of adjoining land progresses with it. Lane v. United States, 274 Fed. 290 (CCA 5, 1921); Harper v. Holston, 119 Wash. 436, 205 P. 1062 (1922).
"Meander lines will not be established at the segregation line between upland and swamp or overflowed land, but at the ordinary high-water mark of the actual margin of the river or lake on which such swamp or overflowed lands border."
It is a generally accepted principle that a meander line is intended to mark the high-water elevation of an adjacent body of water in order to show the general location of the water's boundary and the quantity of land lying within the area surveyed. As said by Clark:
"Inasmuch as it is not practicable in public-land surveys to meander in such a way as to follow and reproduce all the minute windings of the high-water line, the United States Supreme Court has given the principles governing the use and purpose of meandering shores in its decision in a noted case as follows:
"Meander lines are run in surveying fractional portions of the public lands bordering on navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of land in the fraction subject to sale, which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border *394 line of the stream, and shows to a demonstration that the water-course, and not the meander line as actually run on the land, is the boundary. St. Paul & P.R.R. Co. v. Shurmeier [Schurmeir] 7 Wall (74 US) 272, 19 L.Ed. 74 (1868)."[2]
It is an established and accepted principle, subject only to the exceptions hereinafter noted, that the meander line of an official government survey does not constitute a boundary, rather than the body of water whose shoreline is meandered is the true boundary. Furthermore, where the original government land office plat shows a tract of land to have as its boundary a body of water, such water course is a natural monument which will constitute the boundary of the land, even if distant or variant from the position indicated for it by the meander line, and will control as a call of the survey over either distances or quantity of land designated in the conveyance or on the government plat.[3] Our Supreme Court adhered to the foregoing general rule in holding that where a patent to public land refers to the field notes and plats of an official survey, which field notes and plats show that the land is bounded by a permanent body of water, and that in making the official survey the waters were in fact faithfully meandered, the water line, and not the meander line, is the general boundary.[4]
The only exceptions to the foregoing principle, that it is the water line and not the traverse line which forms the boundary of the land surveyed, are those instances in which disputed lands lying between a traverse line and the body of water which it meanders were intentionally omitted from the survey or were omitted therefrom as a result of gross error or fraud.[5] It is this principle on which defendant relies to establish his right of title to the disputed lands in this case. It is our view that his reliance on this principle as support for his position is unfounded. All of the evidence in the record militates against the contention that the lands claimed by him and lying between the northern traverse line shown in the Pidgeon field notes and the waters of Grand Lagoon were intentionally omitted from the original survey by Pidgeon in 1908. In fact, the evidence of intention appears quite to the contrary. The record is devoid of any evidence that the disputed lands involved herein were omitted from the original 1908 Pidgeon survey either because of gross error or fraud. Since there is no evidence to support the contention that the land claimed by defendant falls within the exceptions to the general rule regarding the purpose and effect of meander lines formed by the traverses contained in the original field notes, we hold that the trial court correctly applied the general principle of law to the facts in this case in holding that the waters of Grand Lagoon on the north and the Gulf of Mexico on the south form the natural boundaries of Perdido Key and that all land lying between such bodies of water was conveyed by the United States to plaintiff's predecessor in title and is now owned by it.
For the foregoing reasons, the judgment appealed herein is affirmed.
CARROLL, DONALD K., Acting C.J., and RAWLS, J., concur.
NOTES
[1] Manual of 1947 cited in Clark on Surveying and Boundaries 256, 257, § 238, (Third Edition).
[2] Clark on Surveying and Boundaries 262, 263, § 243, (Third Edition).
[3] Trustees of Internal Improvement Fund v. Toffel, (Fla.App. 1962) 145 So.2d 737, cert. den. (Fla. 1963) 153 So.2d 305; Calder v. Hillsboro Land Company, (Fla. App. 1960) 122 So.2d 445; Railroad Co. v. Schurmeir, 74 U.S. (7 Wall) 272, 19 L.Ed. 74 (1868); Mitchell v. Smale, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428.
[4] South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672.
[5] Lord v. Curry, 71 Fla. 68, 71 So. 21; Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1899); Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895); South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672; Jeems Bayou Hunting & Fishing Club v. United States, 274 F. 18 (5th Cir.1921).