David NOURACHI, as Trustee empowered to buy, sell, encumber and manage real property of the HW 44 Lakefront Trust, a Florida Land Trust under F.S. 689/071 dated 12/8/02, Plaintiff,

v.

UNITED STATES of America, Villie M. Smith, Marion County Property Appraiser, Marion County, Florida, Defendants.

Case No. 5:08–cv–70–Oc–10GRJ.

United States District Court,
M.D. Florida,
Ocala Division.

Aug. 19, 2009.

and the accompanying judgment to the plaintiff.

Patrick A. McGee, McGee & Powers, PA, Orlando, FL, for Plaintiff.

Lacy R. Harwell, Jr., U.S. Attorney's Office, Tampa, FL, Charles Roy Forman, Vanessa Thomas, Forman, Hunratty & Montgomery, Robert Jeffrey Fowler, Thomas L. Wright, Marion County Attorney's Office, Ocala, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WM. TERRELL HODGES, District Judge.

This is an action to quiet title against the United States or, contingent upon the success of that claim, for damages against Marion County, Florida.

The dispute involves the boundaries of a parcel of real property in the Lake Bryant (or Mill Dam Lake) area of the Ocala National Forest. The Plaintiff claims title under a tax deed issued by the County. The United States claims title under an earlier deed from the then private owner of the property (or contiguous property).

The parcel in question implicates Lots 1 and 2 of Fractional Section 20, Township 15 South, Range 25 East, Marion County, State of Florida.

The Township was surveyed by the General Land Office in 1849, and the land lying within the resulting plat was patented by the United States to the State of Florida in 1892. The property in question thereafter found its way into private ownership, and a dependent resurvey was performed by the GLO at the request of the Forest Service in 1932 incident to the acquisition of lands which became a part of the Ocala National Forest. Prior to the resurvey, State Road 40 had been constructed running East to West through the Township bisecting Lots 1 and 2 of Fractional Section 20. This case involves the land abutting the meandered shoreline of Lake Bryant in Lot 2 North of SR 20 and East of the canal connecting upper and lower Lake Bryant.

The deed from which the United States derives its title is dated January 19, 1937, signed by C.A. Savage, Jr., and Dorothy R. Savage, his wife, as grantors. The Plaintiff does not dispute that the Savages had title at the time to all of the land in dispute; rather, the question is: what land was conveyed by that deed? After describing, and transferring certain other lands in the area, the pertinent portion of the Savage deed conveyed:

ALSO, Government Lots Two (2) and Four (4) in Section Seventeen (17); Government Lot One (1), *that part of Government Lot Two (2) East of the East meander line of Lake Bryant* [in Sec. 20, Township 15 South, Range 25 East] more particularly described as follows: (Emphasis supplied, metes and bounds description omitted.)

The tax deed from Marion County, upon which the Plaintiff relies, is dated December 18, 2002, and conveyed (or purported to convey):

Sec 20 TWP 15 RGE 25 THAT PART OF GOVT LOT 2 LYING N OF SR 40 & E OF CANAL

The anomaly that gives rise to the case is the fact that the metes and bounds description in the Savage deed to the United States was in error with respect to its calls and distances to the Point of Beginning, an error of 105.6 feet, complicated by the fact that the shoreline of Lake Bryant receded to the Northwest between the surveys of 1849 and 1932. On that much the parties agree. They disagree on the manner in which that erroneous description should be interpreted or corrected when applied on the ground. In essence, the Government claims title up to the present shoreline of Lake Bryant while the Plaintiff claims title to that portion of Lot 2 lying outside of the metes and bounds description as written in the Savage deed.

Florida law supplies the rule of decision; and, under Florida law, in resolving any uncertainty caused by property descriptions in a deed conveying real property, the Supreme Court of Florida has held:

[I]n the construction of deeds generally it is the duty of the court to ascertain and give effect to the intention of the parties, and for this purpose it may consider the situation of the property and of the parties, and the surrounding circumstances at the time the instrument was executed; also a practical construction of the instrument given by the parties themselves by their conduct . . .

*Kotick v. Durrant*, 143 Fla. 386, 196 So. 802, 804 (1940).

Upon due consideration of all of the evidence, and the arguments of counsel, the Court is persuaded that a preponderance of the evidence concerning the intent of the parties to the Savage conveyance favors the position of the United States and the Plaintiff is not entitled to the quiet title decree that he seeks.

In explication of that decision, the court now makes the following, more specific—

### FINDINGS OF FACT

1. In 1849, the General Land Office (GLO) performed the original survey ("GLO 1849 Survey") of Township 15 South, Range 25 East and prepared a plat which depicted the boundaries of Fractional Section 20 and the meander lines of Lake Bryant. (Trial Transcript [hereinafter "TT"]. Day One, Lange at 25–28) (Govt. Ex. 1).

2. When performing the GLO 1849 Survey, the field surveyors meandered the sinuosities along the high water mark of the lakeshore of Lake Bryant. The high water marks were depicted as the meander lines of Lake Bryant on the GLO 1849 Survey. (TT, Day One, Lange at 27–28) (Govt. Ex. 1).

3. The field surveyors surveyed and subdivided Township 15 South into 36 sections, including Fractional Section 20. They set corners on the exterior of the sections. Based upon the field survey work and field notes, the GLO prepared the plat of Township 15 South, including Fractional Section 20, and subdivided the sections, including Fractional Section 20, into government lots. (TT, Day One, Lange at 32) (Govt. Ex. 1).

4. The boundary line between Government Lots 1 and 2 within Township 15 South, Fractional Section 20, was depicted on the GLO 1849 Survey Plat as the west sixteenth line going north and south. (TT, Day One, Lange at 32) (Govt. Ex. 1). The north corner of Government Lot 2 was established and depicted on the GLO Original 1849 Survey Plat as the intersection of the west sixteenth line and the 1849 east meander line of Lake Bryant. (TT, Day One, Lange at 59) (Govt. Ex. 1). In describing Government Lot 2, the property description begins at the point ("POB") where the west sixteenth line within Section 20 intersects the 1849 east meander line of Lake Bryant, which is the north corner of Government Lot 2 as depicted on the GLO 1849 Survey. (TT, Day One, Lange at 35) (Govt. Ex. 1).

5. After the plat of the GLO 1849 Survey was prepared, including the establishment and depiction of the north corner of Government Lot 2, the plat was used to patent the lands and convey them to the State of Florida in 1892. The patent included riparian rights. A patent is a document used to convey the government's interest in public domain lands. (TT, Day One, Lange at 30, 32, 34, 97).

6. Once a government survey locates a government lot corner such as the north corner of Government Lot 2, the lot corner is permanently set for all purposes once the lands are patented. (TT, Day One, Lange at 30–31, 74, 142.)

7. The GLO 1849 Survey delineates that Government Lots 1 and 2 bordered Lake Bryant and, therefore, both lots held riparian interests when the United States patented these lots to the State of Florida

in 1892. (TT, Day One, Lange at 34–35) (Govt. Ex. 1).

8. In the late 1920's the Forest Service began to investigate a potential acquisition of property in the area of the Ocala National Forest. (TT, Day One, Lange at 43). In 1929, at the request of the Forest Service, GLO performed a dependent resurvey of Township 15 South, Range 25 East. The plat of this dependent resurvey was approved in 1932 ("GLO 1932 Resurvey"). (TT, Day One, Lange at 35–37) (Govt. Ex. 2).

9. A dependent resurvey is a retracement of an original survey. (TT, Day One, Lange at 36; Day Two, Bannerman at 9). The purpose of the dependent resurvey was to reestablish the original corners of the GLO 1849 Survey and re-meander the boundaries of Lake Bryant. (TT, Day One, Lange at 37).

10. In performing the dependent resurvey, the surveyors retraced the footsteps of the original surveyors, seeking to recover as much evidence of the original corners as possible, and then reestablished any missing or lost corners based upon the GLO 1849 Survey. The surveyors followed set procedures to reestablish the original corners of the GLO 1849 Survey. (TT, Day One, Lange at 36–37, 43; Day Two, Bannerman at 9).

11. The surveyors measured and meandered the shoreline of Lake Bryant as it existed in 1929. (TT, Day One, Lange at 37) (Govt. Ex. 2).

12. The surveyors' notes of the dependent resurvey were recorded in the original field notes, which were published by GLO. (TT, Day One, Lange at 38) (Govt. Ex. 18). The 1929 field notes were submitted by the GLO which prepared the plat of the GLO 1932 Resurvey. (TT, Day One, Lange at 42) (Govt. Ex. 2). The surveyors' notes explicitly provide that the meander line of Lake Bryant within Government Lot 2, of Township 15 South was

*right at the shoreline.* (TT, Day One, Lange at 39–42, 144–147) (Govt. Ex. 18).

13. The GLO 1932 Resurvey did not move or alter the corners that were originally established and depicted on the GLO 1849 Survey, and specifically delineated the north corner of Government Lot 2 in the same location as it was delineated on the GLO 1849 Survey, *i.e.,* the intersection of the west sixteenth line and the east meander line of Lake Bryant as shown on the 1849 survey. (TT, Day One, Lange 42–43) (Govt. Ex. 2).

14. The GLO 1932 Resurvey did not disturb in any way the riparian interests of Government Lots 1 and 2. (TT, Day One, Lange at 43, 34–35).

15. The GLO 1932 Resurvey delineated the meander line of Lake Bryant as a solid line and delineated the original meander line of Lake Bryant in the GLO 1849 Survey as a dashed line. The lines were in different locations, indicating that the eastern high water line of Lake Bryant had receded between 1849 and 1932. (TT, Day One, Lange at 42, 52, 147–148) (Govt. Ex. 2). The GLO surveyors recognized the difference in the 1849 and 1932 meander lines, but concluded that there were no omitted lands. (TT, Day One, Lange at 140–141). A meander line is not surveyed as a boundary. When the Government (or, in Florida, where any grantor) conveys title to a fractional parcel of land fronting on a navigable body of water, the conveyance extends to and follows the water's edge absent a clearly expressed intention to the contrary.

16. On September 1, 1936, a private title attorney who handled the acquisition of Forest Service Tract C–8a on behalf of the Forest Service concluded that Charles A. Savage, Jr., was a riparian owner and that as such he was entitled to be compensated for the lands he owned in Township 15 South up to the then present high water

mark of Lake Bryant if the recession of the waters of the lake was gradual and/or imperceptible. (TT, Day One, Lange at 51–52, 54) (Govt. Ex. 20).

17. The assistant Regional Forester confirmed that Mr. Savage was a riparian owner and deserved to be compensated for the lands up to the then present high water mark of Lake Bryant. (TT, Day One, Lange at 66–67,150–153) (Govt. Ex. 23).

18. On or about December 28, 1934, in order to reconcile the difference between the 1932 and 1849 meanders, the Forest Service requested assistance from GLO. In a letter dated January 11, 1935, GLO responded by advising the Forest Service, *inter alia*, that when additional property or land has been created by accretion or reliction, each riparian owner should get a proportional share of the new shoreline. (TT, Day One, Lange at 44–49) (Govt. Ex. 19). A surveyor should properly apportion the property between lots so that each owner will get his proportional share of the shoreline, i.e., the new meandered shoreline. (TT, Day One, Lange at 49). This guidance regarding proration was consistent with accepted principles of surveying and established law. (TT, Day One, Lange at 47–50, 94, 134) (Govt. Ex. 19).

19. In order to prepare the property description for the Savage's deed, a Forest Service engineering draftsman, A.L. Maxwell, prepared a draft metes and bounds description of Government Lot 2. Maxwell relied upon the field notes from the GLO 1932 Resurvey in preparing the description including the meander line calls along the east meander line of Lake Bryant which were noted by the surveyors as being *right at the shoreline*. The draft property description therefore contains metes and bounds calls that were intended to be *right at the shoreline* of the east meander line of Lake Bryant. (TT, Day One, Lange at 53–56, 58) ( Govt. Exs. 30, 18).

20. This draft metes and bounds property description of Government Lot 2 describes the prorated shoreline along Government Lot 2, and the resulting boundary line between Government Lots 1 and 2. (TT, Day One, Lange at 56, 62–63) (Govt. Exs. 18, 30).

21. In September 1936, Maxwell also prepared an acquisition plat of Government Lot 2, which delineates the meander line of Lake Bryant as the then *present shoreline*. This Acquisition Plat is consistent with the field notes from the GLO 1932 Resurvey. (TT, Day One, Lange at 57–59, 73–74, 143–144) (Govt. Ex. 3).

22. The September 1936 Acquisition Plat also delineated the prorated shoreline of Government Lot 2 and the resulting boundary line between Government Lots 1 and 2. (TT, Day One, Lange at 58–59, 73–74.) (Govt. Ex. 3).

23. The September 1936 Acquisition Plat is consistent with the GLO 1849 Survey and the GLO 1932 Resurvey. The Acquisition Plat depicts the east boundary line of Government Lot 2 and the west sixteenth (north-south) line as one and the same line as depicted on the two GLO surveys. The Acquisition Plat shows the prorated boundary lines between Government Lots 1 and 2, and shows the calls along the shoreline of Lake Bryant that were taken directly from the GLO 1932 Resurvey.

24. The POB of Government Lot 2 as depicted on the Acquisition Plat is the same north corner of Government Lot 2 as depicted on the GLO 1849 Survey and the GLO 1932 Resurvey, *i.e.*, the intersection of the west sixteenth line and the 1849 meander line. (TT. Day One, Lange at 58–59) (Govt. Exs. 1–3).

25. Based upon the advice from GLO, the Forest Supervisor confirmed that the Forest Service properly prorated the riparian interests between Government Lots 1 and 2. (TT, Day One, Lange at 63–65.) (Govt. Exs. 22, 19) (October 10, 1936).

26. The Forest Service's draft property description described the "POB" as being located at the north line of Government Lot 2. This POB is the same corner as delineated on the GLO 1849 Survey and on the GLO 1932 Resurvey, i.e., the intersection of the west sixteenth line (running north-south) and the 1849 meander line of Lake Bryant. (TT, Day One, Lange at 58–59, 74) (Govt. Exs. 1, 2, 30).

27. The September 1936 Acquisition Plat also delineated the POB of Government Lot 2 as the intersection of the west sixteenth line with the 1849 meander line of Lake Bryant, in the same place as it is delineated on the GLO 1849 Survey and on the GLO 1932 Resurvey. This POB is also referenced in the 1937 Warranty Deed as the point of beginning at the north boundary of Lot 2. (TT, Day One, Lange at 58–59, 61–62, 74) (Govt. Exs. 1–3).

28. GLO advised the Forest Service inter alia, that when it measures meander lines of a lake, the actual shoreline of the body of water and not the meander line is the boundary line. (TT, Day One, Lange at 46, 84) (Govt. Ex. 19).

29. The surveyors' notes from the GLO 1932 Resurvey explicitly provide that the meander line of Lake Bryant within Government Lot 2 was right at the shoreline. (TT, Day One, Lange at 39–42) (Govt. Ex. 18). The Forest Service engineering draftsman who prepared the Forest Service draft property description of Government Lot 2 used the calls directly from the field notes, including the meander calls that were right at the shoreline of Lake Bryant. (TT. Day One, Lange at 54–55) (Govt. Exs. 18, 30).

30. On January 19, 1937, Charles A. Savage, Jr., and his wife, Dorothy R. Savage, conveyed, inter alia, all of Government Lot 1 and all of Government Lot 2 east of the east meander line of Lake Bryant to the United States. That part of Government Lot 2 east of the east meander line of Lake Bryant was more specifically described by a metes and bounds description that erroneously placed the point of beginning more than 100 feet south of its correct location according to the 1849 and 1932 GLO surveys. (TT, Day One, Lange at 60–61) (Govt. Ex.6).

32. In any event, the Savages did not except or reserve their riparian rights to Government Lots 1 and/or 2, and it was clearly the legal effect and the intent of both the United States and the Savages that those rights were conveyed to the Government in consideration of the purchase price specified in the deed. It is significant, consistent with that conclusion, that there is no evidence that the Savages have ever asserted a position to the contrary.

33. GCY, Incorporated, professional surveyors and mappers, was engaged by the Forest Service to survey the parcel of property conveyed by the 1937 deed from the Savages to the United States.

34. Prior to directing and performing the GCY 2008 Survey as Project Manager, Scott Allen Bannerman conducted background research including reviewing the GLO 1849 Survey, GLO 1932 Resurvey, field notes from both GLO surveys, and the Savages' 1937 Warranty Deed. (TT, Day Two, Bannerman at 4–5).

35. GCY visited all of the corners that represented the perimeter boundaries of Fractional Section 20. GCY recovered some corners from the GLO 1932 Resurvey which were monumented with iron pins, but no original corners from the GLO 1849 Survey. (TT, Day Two, Bannerman

at 9–14) Bannerman established the perimeter of Section 20 and calculated the aliquot lines of Fractional Section 20 including the easterly meander lines from both the GLO 1849 Survey and GLO 1932 Resurvey. (TT. Day Two, Bannerman at 15).

36. Bannerman was then able to calculate the location of the property described in the Savages' 1937 Warranty Deed. (TT, Day Two, Bannerman at 15). Bannerman established the POB for Government Lot 2 by establishing the west sixteenth line of Fractional Section 20 and intersecting it with the 1849 meander line. This intersection is also shown on the GLO 1932 Resurvey. (TT, Day Two, Bannerman at 16.) (Govt. Exs. 1, 2, 17.)

37. Although there was a conflict in the calls of the property description of Government Lot 2 in the Savages' 1937 Warranty Deed, Bannerman resolved the conflict and located the corner by resort to the generally accepted surveying rule that gives weight to an artificial monument over a distance call. (TT, Day Two, Bannerman at 16–17, 27–28, 42–44, 57, 63–64).

38. The GCY survey properly locates and delineates the north boundary line of Government Lot 2 and the south boundary line of Government Lot 1 ("Line L5"). The GCY survey proportions the old meander line shown on the GLO 1849 Survey and the meander line of the GLO 1932 Survey. In doing so, Bannerman followed recognized surveying principles. (TT, Day Two, Bannerman at 18, 58, 64–67, 70) (Govt. Ex. 17).

39. Bannerman also used a well accepted surveying principle of the least squares method to correct a misclosure created by the 1937 Warranty Deed's description. The least squares method distributes the magnitude of error caused by a legal description's literal calls throughout the traverse and not just on one line. The least squares method necessitated minor adjustments in the bearings and distance calls from the GLO 1932 Resurvey. (TT, Day Two, Bannerman at 28–30, 34). These adjustments are a common practice.

40. Bannerman concluded that the Savages' 1937 Warranty Deed conveyed all property situated east of the east meander line of 1932 to the United States because an intent to make such a conveyance appears from a variety of facts and circumstances, among them: (a) the metes and bounds in the Savages' 1937 Warranty Deed as prepared by the Forest Service were identical to the metes and bounds in the field notes of the GLO 1932 Resurvey for the 1932 meander line; (b) intent of the Forest Service—and, by implication, the intent of the Savages—was to compensate the Savages for their riparian rights; (c) the historical records contained in the Forest Service acquisition file reveal such intent; (d) the BLM (Bureau of Land Management) Manual direction that the meander lines run along the mean high water line; and (e) the property description provided at the end: "all contained within and being the boundary of lot two east of the east meander line of Lake Bryant." (TT, Day Two, Bannerman at 34–42, 49–52, 77, 80) (Govt. Ex. 30).

41. Bannerman reached the common sense conclusion that the water level of Lake Bryant receded between 1932 and the present time because the 1932 meander line was described by surveyors at the time as being right at the shoreline, and the water level today is presently lower than the 1932 meander line. (TT, Day Two, Bannerman at 52). He testified that the narrow strip of land currently situated between the 1932 meander line and the *current* shoreline is a wet and swampy looking area. (TT, Day Two, Bannerman at 23).

42. The GCY Survey is consistent with the BLM Manual, the GLO 1849 Survey, the GLO 1932 Resurvey and the Forest

Service draft acquisition plat. (TT, Day One, Lange at 88; 125–126).

43. The Plaintiff's surveyor, Larry Ray Efrid, Jr., was engaged to survey the property described in the Plaintiffs 2002 Tax Deed. He did not formally survey the 1937 Warranty Deed, but merely made an informal drawing or sketch of it on his survey of the Tax Deed property description. (TT, Day One, Efrid at 180–181) (Pl's. Ex. 21).

44. Efrid located two points of beginning for Government Lot 2 separated by more than 100 feet, the POB depicted on the GCY 2008 Survey and the POB allegedly corresponding to the literal metes and bounds call in the Savages' 1937 Warranty Deed. He admitted, however, that if he had been surveying the 1937 Warranty Deed, he may have made the same conclusion with regard to correctly fixing the POB of Government Lot 2 in the same location as delineated on the GCY 2008 Survey. (TT, Day One, Efrid at 169–170).

45. Efrid improperly located the POB of Government Lot 2 by placing greater weight on the literal distance call in the 1937 Warranty Deed over the deed's call to go to the artificial monument of the point of beginning at the north boundary of Government Lot 2. (TT, Day One, Efrid at 188, 190). In doing so Efrid ignored a standard surveying rule regarding the priority or hierarchy of calls, which applies to both public and private lands. (TT, Day One, Lange at 68–71, 143; Efrid at 168; Day two, Bannerman at 24–25) (Govt. Exs. 1–3, 6, 17; Pl's. Ex. 21).

46. The true POB of Government Lot 2 is the intersection of the west sixteenth line and the 1849 meander line, which is the north corner of Government Lot 2. As such, it is an artificial monument, and the call of the 1937 deed to go to the POB should have been given priority by Mr. Efrid over the call to go four chains. (TT,

Day One, Lange at 71; Day Two, Bannerman at 16–17).

47. The Efrid 2009 Survey erroneously notes a misclosure in the metes and bounds description of Government Lot 2 contained in the 1937 Warranty Deed. (TT, Day One, Lange at 72–73.) Mr. Efrid ignored that portion of the call in the 1937 Deed to return to *the point of beginning.* In failing to give weight to the artificial monument (the POB) over the distance call, Efrid's survey stops approximately 16 feet short of the POB and thus creates the misclosure. (TT, Day One, Lange at 72–73; Day Two, Bannerman at 79). The Efrid survey violates the hierarchy of calls in this respect as well.

48. The Efrid 2009 Survey also fails to prorate the current shoreline between Government Lots 1 and 2. (TT, Day One, Lange at 73–77, 142–143; Day Two, Bannerman at 25–26). The failure to properly apportion the current shoreline and riparian rights between Government Lots 1 and 2 results in an erroneous and arbitrary boundary line between Government Lots 1 and 2, and severs a portion of Government Lot 1's riparian rights.

49. The Clerk of the Circuit Court for Marion County, Florida caused the following erroneously described property to be sold to the Plaintiff at a tax sale on December 18, 2002 for the sum of $22,600.00:

SEC 20 TWP 15 RGE 25

THAT PART OF GOVT LOT 2

N OF SR 40 & E OF CANAL

50. In 2003, the Forest Service informed the Marion County Property Appraiser's Office that it had made a mistake with regard to the 2002 tax sale and resulting tax deed issued to the Plaintiff. The Forest Service further informed Marion County that the United States owned the disputed property pursuant to its prior

1937 Warranty Deed from the Savages. (TT, Day One, Minchew at 13–14).

51. The Marion County Property Appraiser's Office conducted an independent investigation and concluded that the United States did, in fact, own the disputed property. The Property Appraiser's Office corrected the mistake in the public record to reflect the disputed property as owned by the United States. To this date, the tax rolls of Marion County continue to show that the United States owns the disputed property. (TT, Day One, Minchew at 14–17) (Govt. Ex. 27).

52. Neither the Marion County Property Appraiser's Office or Marion County have refunded to the Plaintiff the sum paid for the purchase of the tax deed ($22,-600.00) and the Plaintiff is entitled to judgment against the County for that amount plus interest at the lawful rate since December 18, 2007.

**CONCLUSIONS OF LAW**

■ 1. Although the GLO 1932 Resurvey delineated the meander line of Lake Bryant, the mean or ordinary high water mark, and not the meander line, formed the actual boundary of Lake Bryant and the lots contiguous to the lake. As the Supreme Court has observed:

Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.

In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water-course, and not the meander line, as actually run on land, is the boundary.

*St. Paul and Pacific R.R. Co. v. Schurmeier,* 74 U.S. (7 Wall.) 272, 19 L.Ed. 74, 78 (1868). Thus, the mean high-water line meandered in 1929 formed the western boundary line of Government Lots 1 and 2.

It is an established and accepted principle, subject only to the exceptions hereinafter noted, that the meander line of an official government survey does not constitute a boundary, rather than the body of water whose shoreline is meandered is the true boundary. Furthermore, where the original government land office plat shows a tract of land to have as its boundary a body of water, such water course is a natural monument which will constitute the boundary of the land, even if distant or variant from the position indicated for it by the meander line, and will control as a call of the survey over either distances or quantity of land designated in the conveyance or on the government plat. Our Supreme Court adhered to the foregoing general rule in holding that where a patent to public land refers to the field notes and plats of an official survey, which field notes and plats show that the land is bounded by a permanent body of water, and that in making the official survey the waters were in fact faithfully meandered, the water line, and not the meander line, is the general boundary.

*Connery v. Perdido Key, Inc.,* 270 So.2d 390, 394 (Fla. 1st DCA 1972) (footnotes omitted).

■ 2. Lands situated below the 1932 eastern meander line of Lake Bryant were at that time below the high water line of Lake Bryant and belonged to the State of Florida. No private party could convey those submerged lands. The 1932 meander line, as evidence of the ordinary high water mark, was the boundary line between the submerged sovereignty lands of Florida and the uplands which were owned

by the Savages. *Florida Dept. of Nat'l Res. v. Contemporary Land Sales, Inc.,* 400 So.2d 488, 492 (Fla. 5th DCA 1981).

■ 3. As the owners of land situated contiguous to the 1932 eastern meander line of Lake Bryant, which was the high water line of Lake Bryant, the Savages owned riparian rights to Lake Bryant. *Broward v. Mabry,* 58 Fla. 398, 50 So. 826, 830 (1909).

■ 4. Since the 1937 Warranty Deed did not clearly and explicitly except or reserve the Savages' riparian rights, their riparian rights were conveyed to the United States. *Haynes v. Carbonell,* 532 So.2d 746, 748 (Fla. 3rd DCA 1988) ("It is immaterial that the 1967 deed did not expressly convey riparian rights. Being an appurtenance to the upland, riparian interests may be severed only by an 'express bilateral agreement to do so.' ") (quoting *Belvedere Dev. Corp. v. Department of Transp.,* 476 So.2d 649, 653 (Fla.1985)); *Tri–State Enterprises, Inc. v. Berkowitz,* 182 So.2d 40, 43 (Fla. 2nd DCA 1966) (riparian rights follow by operation of law upon any conveyance or encumbrance).

■ 5. The 1937 Warranty Deed conveyed *all* of the Savages' property situated in Government Lot 2 east of the east meander line of Lake Bryant to the United States because the metes and bounds description was based directly upon the 1932 meander line. In resolving any doubtful meaning or ambiguity in the language used by the 1937 Warranty Deed:

[I]t is the duty of the court to ascertain and give effect to the intention of the parties, and for this purpose it may consider the situation of the property and of the parties, and the surrounding circumstances at the time the instrument was executed. . . .

*Kotick v. Durrant,* 143 Fla. 386, 196 So. 802, 804 (1940). Moreover, a deed is to be construed most strongly against the grantor and most beneficially for the party to whom it is made. *Reid v. Barry,* 93 Fla. 849, 112 So. 846, 858 (1927). Where a deed permits more than one interpretation, the one most favorable to the grantee should be adopted. *Thompson v. Ruff,* 75 Fla. 476, 78 So. 489, 490 (1918); *Central & Southern Florida Flood Control District v. Surrency,* 302 So.2d 488, 490 (Fla. 2nd DCA 1974).

6. The historical documents from the Forest Service acquisition file offered in evidence in this case by the Government make it clear that the conveyance described in the 1937 Warranty Deed was intended to convey property down to the ordinary high water mark of Lake Bryant, and to compensate the Savages for their riparian rights. There is no evidence that the Savages had a different intent, and the Court infers, and finds, that the Government and the Savages were of the same mind, sharing the same intent.

■ 7. The United States' claim to the disputed land has its roots in Florida law as it pertains to riparian interests. "In determining the intent of the grantor where an ambiguity exists as to the location of a property boundary line, the ambiguity being caused by a called natural boundary and conflicting called distances, the natural boundary supersedes as a matter of law." *Haynes v. Carbonell,* 532 So.2d 746, 749 (Fla. 3rd DCA 1988).

■ 8. It is legally immaterial that the 1937 Warranty Deed described that portion of Government Lot 2 conveyed to the United States by a metes and bounds description. The unrefuted testimony of the United States' expert witnesses and historical documents, especially the explicit field notes of the GLO 1932 Resurvey, is that the 1932 meander line within Government Lot 2 was *right at the shoreline.* "It is [also] well settled law that a conveyance of lands bordered by a river and intended

to be riparian, though the river boundary is described by metes and bounds, as here, carries with it all accreted lands." *Choctaw and Chickasaw Nations v. Cox*, 251 F.2d 733, 735 (10th Cir.1958) (citations omitted).

> The water course and not the meander line is the boundary, and, although the water course shifts and establishes a new water line away from the meander line as surveyed, such water line remains the boundary, and the conveyance describing the land by lot numbers conveys the land up to such shifting line exactly as it does up to the fixed side lines of the lots, and thereby conveys all accretions that exist at the time of the execution of the conveying instrument.

*Id.* (*quoting Braddock v. Wilkins*, 182 Okl. 5, 75 P.2d 1139, 1140 (Okl.1938)).

9. As a riparian owner, the United States is entitled to receive accretions and relictions. *Haynes v. Carbonell*, 532 So.2d at 749 ("It is settled that riparian and littoral property rights include the right to receive accretions and relictions to the property."). *See, Board of Trustees for the Internal Improvement Trust Fund v. Sand Key, Associates, Ltd.*, 512 So.2d 934, 937 (Fla.1987) ("Many decisions of this Court have accepted the common law principle that title to additional lands caused by accretions and relictions is vested in owners of abutting waterfront lands."). Therefore, the United States owns the disputed property situated between the 1932 meander line and the current shoreline of Lake Bryant.

 10. It was legally impermissible for Efrid to arbitrarily extend the eastern boundary line of Government Lot 2 (the west sixteenth line) northward into Government Lot 1. In doing so, Efrid wrongfully caused a portion of the disputed property to be placed into Government Lot 2. Instead, Efrid was legally required to equitably apportion the 1932 meander line, which was the then high water mark of Lake Bryant, between Government Lots 1 and 2. Not only is this required by the BLM Manual, it is also mandated under Florida law:

> The general rules by which alluvion is apportioned between different littoral owners is, when practicable, [to] allot each proprietor a frontage of the same width on the new shore as on the old shore.

> \* \* \*

> In equitably apportioning lands acquired through accretion or reliction, many methods may be used, *see, e.g.,* Clark, chapters 24 and 25, but no one method is proper or improper. Here the trial judge used the "prolongation of property line" method, that is, he simply extended the Dirscoll's easterly line. However, this method destroyed the Association's littoral rights and effectively denied the homeowners access to the lake. This is clearly unfair and thus the judgment is reversed. . . .

*Lake Conway Shores Homeowners Association, Inc. v. Driscoll*, 476 So.2d 1306, 1308 (Fla. 5th DCA 1985) (quoting *Johnson v. McCowen*, 348 So.2d 357, 360 (Fla. 1st DCA 1977)).

 11. As a matter of well settled law, the Efrid 2009 Survey could not relocate the north corner of Government Lot 2, which was not merely ascertained or identified but established by the GLO 1849 Survey at the intersection of the 1849 meander line with the west sixteenth line.

> It is well settled that the description of land and plats from the field notes of an original survey filed in the General Land Office are conclusive, and section lines and corners as laid down therein are binding upon the General Government and all parties concerned The defendants are charged with knowledge, either actual or constructive, that the pen-

insula in question had been surveyed, platted, and conveyed by the sovereign with reference to and in accordance with the official plat and that title thereto had become vested in plaintiffs long before the defendants sought to acquire the lands by reference to a private resurvey. *Bishop v. Johnson,* 100 So.2d 817, 820 (Fla. 1st DCA 1958).

A survey of public lands does not ascertain boundaries; it creates them. *Cox v. Hart,* 260 U.S. 427, 43 S.Ct. 154, 157, 67 L.Ed. 332 [ (1922) ]. "The quarter lines are not run upon the ground, but they exist, by law, the same as the section lines." *Keyser v. Sutherland,* 59 Mich. 455, 26 N.W. 865, 867 (1886). The location of corners and lines established by the government survey, when identified, are conclusive . . . and the true corner of a government subdivision of a section is where the United States surveyors in fact established it, whether such location is right or wrong, as may be shown by a subsequent survey. *Beardsley v. Crane,* 52 Minn. 537, 54 N.W. 740, 741 (1893). *Vaught v. McClymond,* 116 Mont. 542, 155 P.2d 612, 616 (1945).

12. As to the call in the 1937 Warranty Deed to go "South Thirty-one degrees (31°) West Four (4.00) chains to point of beginning at the North boundary of Lot Two (2)," the law recognizes that calls to artificial monuments control over calls of distances. Therefore, as a matter of law, the call to go to the "North boundary of Lot Two (2)", which is an artificial monument, controls over the call to go "Four (4.00) chains." *Calder v. Hillsboro Land Company,* 122 So.2d 445, 457, 458 (Fla. 2nd DCA 1960).

### CONCLUSION

1. It follows that the prayer of the Plaintiff to quiet title against the United States to that certain real property in Marion County, Florida, described as—

SEC 20 TWP 15 RGE 25

THAT PART OF GOVT LOT 2

N OF SR 40 & E OF CANAL

is hereby DENIED with prejudice.

2. The Plaintiff is entitled to judgment against Marion County, Florida, in the amount of $22,600.00 plus interest at the lawful rate since December 18, 2002.

3. The Clerk is Directed to enter judgment in accordance with paragraphs 1 and 2. Any and all other claims or prayers for relief are DENIED. Upon entry of Judgment as directed, the Clerk shall terminate any unresolved motions as moot, and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this *19th* day of August, 2009.